UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) No. CR22-53-LK |
| Plaintiff, | ) |
|  | ) Seattle, Washington |
| v. | ) |
|  | ) October 5, 2022. |
| ERIC KIKKERT, | ) 10:01 a.m. |
|  | ) |
| Defendant. | ) Sentencing |
|  | ) |
|  | ) |

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE LAUREN KING
UNITED STATES DISTRICT JUDGE

_____

**APPEARANCES:**


For the Plaintiff:          THOMAS M. WOODS.
                            US Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101-1271


For the Defendant:          DENNIS CARROLL
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Westlake Center Office Tower
                            Seattle, WA 98101.

U.S. PROBATION
OFFICER:                    AMELIA WHALEY




Reported by:                MARCI E.C. CHATELAIN, CCR, RPR, RMR,
                            CRR, Federal Court Reporter
                            700 Stewart Street, Suite 17205

Seattle, WA 98101
marci_chatelain@wawd.uscourts.gov
PROCEEDINGS

_____

THE CLERK:  The United States District Court for the
Western District of Washington is now in session, the Honorable
Judge Lauren King presiding.

THE COURT:  Please be seated.

THE CLERK:  We are here in the matter of United States
v. Eric Kikkert, cause number 22-53, assigned to this Court.

Will counsel please introduce themselves for the record?

MR. WOODS:  Good morning, Your Honor.

Tom Woods on behalf of the United States.

THE COURT:  Good morning.

MR. CARROLL:  Good morning, Your Honor.

Dennis Carroll on behalf of Mr. Kikkert, who is seated here
to my left.

THE COURT:  Good morning, Mr. Carroll, and good
morning, Mr. Kikkert.

All right.  We're here today for the sentencing of Mr. Eric
Kikkert.

I'll begin by explaining the process of this sentencing.

And before I do that, I have a lot of screens in front of
me today, and my primary screen is my laptop where I have all
the filings and my notes for today, and where I take notes
during the hearing, so if I'm looking down, I just want you to

know that I'm not ignoring you, I'm probably taking notes on my

laptop or referencing materials related to what you're saying.

So in terms for the process for the hearing today, I'll

start by letting everyone know all the materials I have received

10:03:20    and read in preparation for this sentencing, to make sure I

haven't missed anything.

And actually, I'm going to go ahead and remove my mask.

Then the sentencing will occur in essentially five steps:

First, confirmation of the crime being pled to; second, I will

10:03:37    address the presentence report; third, I'll discuss with the

prosecutor and defense attorney what sentencing guidelines and

sentencing range applies to this case based upon Mr. Kikkert's

criminal history and considering any mitigating or aggravating

factors that may warrant a departure under the sentencing

10:03:59    guidelines manual, and I will enter findings about the

applicable guidelines range.

This part of the hearing, in particular, may sound very

formal, but I'm required to make certain findings for the

record, so bear with me.

10:04:09    Fourth, I will provide time for the prosecutor, defense

attorney, anyone else in the courtroom, and Mr. Kikkert to tell

me what sentence you think is appropriate.

But, Mr. Kikkert, you don't have to talk to me if you don't

want to.  And I won't hold it against you if you choose not to

10:04:27    talk.

1    Finally, I will address the sentencing factors I must

2  consider, and then impose the sentence.

3    I have received and reviewed the following documents

4  submitted in advance of this hearing: the indictment, Plea

10:04:41  5  Agreement, the probation office's status reports, the final

6  presentence investigation report, the probation office's

7  sentencing recommendation, and sentencing memoranda from the

8  government and from Mr. Kikkert and Mr. Kikkert's letter to me.

9    Are there any other documents submitted for sentencing that

10:04:59  10  I did not state on the record or that I should consider?

11    MR. WOODS:  Not aware of any, Your Honor.

12    MR. CARROLL:  No, Your Honor.

13    THE COURT:  All right.  Thank you.

14    Mr. Carroll, can you confirm that Mr. Kikkert has pled to

10:05:11  15  and is here to be sentenced for the crime of making interstate

16  threats in violation of 18 U.S.C. Section 875(c)?

17    MR. CARROLL:  Yes, Your Honor.

18    THE COURT:  The final presentence report was filed on

19  September 19th, 2022 at Docket No. 38.

10:05:31  20    And the probation office's sentencing recommendation was

21  filed on the same day at Docket 39.

22    Ms. Whaley, thank you for your work on the report and

23  recommendation.

24    Is there anything that needs to be corrected or added to

10:05:44  25  the PSR.

1        U.S. PROBATION OFFICER WHALEY:  Not that I'm aware of,

2   Your Honor.

3        THE COURT:  All right.  Mr. Woods, have you received

4   and reviewed the PSR?

10:05:53   5        MR. WOODS:  I have, Your Honor.

6        THE COURT:  Does the government have any objection to

7   any of the factual determinations set forth in the presentence

8   report?

9        MR. WOODS:  We do not.

10:06:01  10        THE COURT:  Mr. Carroll, have you received and read

11   the PSR?

12        MR. CARROLL:  Yes, Your Honor.

13        THE COURT:  Have you discussed the presentence report

14   with your client?

10:06:09  15        MR. CARROLL:  Yes, I have, Your Honor.

16        THE COURT:  Does Mr. Kikkert have any objection to any

17   of the factual statements set forth in the presentence report?

18        MR. CARROLL:  No, not in the presentence report, Your

19   Honor.

10:06:19  20        THE COURT:  All right.  And, Counsel, you may remove

21   your mask when speaking if you would like, but it's your choice.

22        I have a few questions for Mr. Kikkert.  But before I

23   discuss any matters with you today, I'll have our courtroom

24   deputy put you under oath, which is my standard practice in

10:06:36  25   these proceedings.

1          THE CLERK:  Please raise your right hand.

2      Do you solemnly swear or affirm that the testimony you're

3  about to give in the cause now before the Court shall be the

4  truth, the whole truth, and nothing but the truth?

10:06:50  5          THE DEFENDANT:  Yes, I do.

6                    (Defendant sworn.)

7          THE COURT:  Thank you.

8      So, Mr. Kikkert, did you read the presentence report?

9          THE DEFENDANT:  Yes, Your Honor.

10:06:58  10          THE COURT:  Did you discuss the presentence report

11  with your attorney?

12          THE DEFENDANT:  Yes, I did, Your Honor.

13          THE COURT:  Do you feel that you've had enough time to

14  talk with your attorney about the presentence report and the

10:07:07  15  papers filed by the government in connection with this

16  sentencing?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Are you fully satisfied with your attorney

19  in this case?

10:07:14  20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Okay.  Thank you.

22      I'll accept the factual recitation in the presentence

23  report regarding the circumstances of the offense.  And the

24  facts as stated in the presentence report will be the Court's

10:07:28  25  findings of fact for the purpose of this sentencing.

1    So now we arrive at the technical part of this hearing.

2    The presentence report lays out the probation office's

3    calculation of the advisory guideline range that applies in this

4    case.  We get to the guideline range by looking at, first, the

10:07:46  5    offense level; and second, Mr. Kikkert's criminal history

6    category.

7    Using the 2021 Guidelines Manual, the calculation is as

8    follows:

9    With respect to the offense level, beginning with the

10:07:59  10    guidelines offense level, the applicable guideline in this case

11    is Section 2A6.1, which has a base offense level of 12.

12    Because the offense involved more than two threats, the

13    guidelines add two levels.

14    And because the sentencing guidelines Sections 3A1.2(a)(1)

10:08:20  15    and (2) apply, as the victims are government officers, the

16    guidelines adds six levels.

17    After these adjustments, the offense level total --

18    subtotal is 20.

19    The presentence report indicates that Mr. Kikkert has

10:08:35  20    demonstrated acceptance of responsibility, so pursuant to

21    sentencing guideline section 3E1.1, there is a three level

22    decrease; therefore, prior to the consideration of any

23    departures or variances, Mr. Kikkert's total offense level is

24    17.

10:08:53  25    Is there any objection to the calculation of the offense

1  level?

2          MR. WOODS:  No, Your Honor.

3          MR. CARROLL:  No, Your Honor.

4          THE COURT:  Turning to the applicable criminal history

5  category, the presentence investigation has found that

6  Mr. Kikkert has prior convictions that receive one criminal

7  history point under section 4A1.1(c) in the guidelines manual.

8  This puts Mr. Kikkert in criminal history category I.

9      Are there any objections to the criminal history

10  calculation?

11          MR. WOODS:  No, Your Honor.

12          MR. CARROLL:  No, Your Honor.

13          THE COURT:  In terms of statutory limitations on the

14  sentence today, the statutory maximum term of imprisonment is

15  five years under 18 U.S.C., 875(c), and the Court may not impose

16  a term of supervised release of more than three years under 18

17  U.S.C., Section 3583(b)(2).  Given a criminal history category

18  of 1 and an adjusted offense level of 17, the applicable

19  sentencing range in this case under the guidelines is 24 to 30

20  months of imprisonment.  And since the offense is a Class D

21  Felony, the guideline range for a term of supervised release is

22  one to three years under Section 5D1.2(a)(2) of the guidelines.

23      Are there any objections to these calculations?

24          MR. WOODS:  No, Your Honor.

25          MR. CARROLL:  No, Your Honor.

1    THE COURT:  Have I stated accurately the statutory and

2  guidelines framework under which we are operating in regards to

3  this case?

4    MR. WOODS:  Yes, Your Honor.

10:10:22    5    MR. CARROLL:  Yes, Your Honor.

6    THE COURT:  Having determined the applicable guideline

7  range, the next step is for the Court to consider departures.

8    The presentence report does not include any departure

9  grounds and neither party has mentioned any.

10:10:35   10    Is there any basis for a departure as distinguished from a

11  variance that the parties wish to assert?

12    MR. WOODS:  No, Your Honor.

13    MR. CARROLL:  No, Your Honor.

14    THE COURT:  Before I discuss the Section 3553(a)

10:10:49   15  factors that will bear on my final decision, I would like to

16  give the parties the opportunity to address the sentencing

17  guideline calculation, the 3553(a) factors, the special

18  conditions, or anything else you believe I should consider.

19    Mr. Woods, does the government wish to speak?

10:11:07   20    MR. WOODS:  Yes, Your Honor.  Thank you.

21    Your Honor, there are two values that I think are

22  particularly important in trying to determine the right sentence

23  and outcome in this case.  And unfortunately, they pull in

24  opposite directions.  And they are compassion and public safety.

10:11:32   25    And let's start with compassion.  You know, a lot of online

threat cases, particularly those that are directed at political leaders, are grounded in malice, grounded in ill will, in spite, in some true wrongdoing fashion where the intent is purely ill will.

Here, it's a more complicated picture.  And Mr. Kikkert, when he was involved in this offense, was not well.  He was sick.  He was ill.  He knew what he was doing.  He purposely wanted people to be scared, that is true, and that's why this case is properly before this Court, and the basis for Mr. Kikkert's plea, but his mind was not well.

And that's particularly disheartening and sad because of Mr. Kikkert's history, his service to this country, under conditions that I could not even begin to imagine or describe and understand how that must have been in terms of what he experienced in Iraq and then the return to this country.

The compassion weighs very heavily in how the government looked at this case and its ultimate recommendation that a term of imprisonment is not appropriate.

But public safety is a very important piece of this puzzle. When we were evaluating this case, when it first came to light, you know, I talked to the King County Prosecutor who was in charge of civil commitment.  And then that was a possible option for Mr. Kikkert, to just stay in civil commitment proceedings. And we just concluded, she concluded, that the safety risks were just too high to let this case just stay in a civil setting.

1   And you can understand why that's the case.  I mean, Mr. Kikkert

2   didn't simply just spout online, didn't just simply post things

3   or make phone calls, he tried to get a gun.  And it is not true

4   that the gun crisis in this country is caused by the mentally

5   ill, that's not what drives violence in the country, but the

6   opposite is true, which is that there are notable examples for

7   people who are suffering and dealing with extreme mental illness

8   carry out horrific crimes.  And I don't need to list what those

9   are for the Court.

10      And what happened here was scary.  I mean, Mr. Kikkert was

11  repeatedly saying he was going to carry out acts of violence.

12  He talked about getting a gun, despite being a prohibited

13  person.  And he traveled all the way across the country from

14  Kent, Washington to Washington, D.C. to confront the very

15  officials he was talking about harming.

16      And I didn't include for the Court's consideration the

17  actual audio recordings of some of the voicemails he left.  I

18  didn't want to sort of sensationalize the sentencing.  Mr.

19  Carroll has them.  And if he thinks I'm misinterpreting them, he

20  can tell the Court that, but they're scary to hear because he's

21  clearly not in a right state of mind.  At one point he's singing

22  for a good minute and a half some random song and then delves

23  into words of extreme violence.  It was a concerning picture.

24  And it's because of that framework, because of the extreme

25  concern about public safety, that these conditions of

10:14:04
10:14:24
10:14:45
10:15:02
10:15:29

1    supervision I think are critical for the Court to consider and

2    impose.

3         And they sort of break into two categories in terms of

4    what's in dispute for the Court:  Mental health conditions and

10:15:50    5    then electronic monitoring conditions.

6         And for the mental health conditions, if we just step back

7    for a moment, I think two things are worth mentioning.  The

8    first is Mr. Kikkert is currently operating under those

9    conditions as a condition of the pretrial bond in this case.

10:16:10    10    So, really, the question for the Court is less if you think

11    about it should the Court impose those, it's should the Court

12    relax those.  I mean, I understand, ultimately the question for

13    the Court is whether to issue those as part of the judgment.

14         But that's what the status quo is now, he's subject to

10:16:27    15    those conditions as part of the Court's pretrial bond

16    authorizing his release in this case.

17         And second, these conditions were not sort of presented to

18    the Court out of whole cloth.  As the Court saw in our

19    sentencing memo, they've been imposed in other cases with the

10:16:49    20    Federal Public Defender's Office.  And they were the product of

21    negotiation with a senior attorney at the Federal Public

22    Defender's Office, started in the *Verhul* case, which was

23    assigned to Judge Jones that I cited in our memo.  And they

24    represent a balance of the liberty interests and other interests

10:17:11    25    of Mr. Kikkert versus insuring his safety and his compliance.

1    And so -- and specifically, the two mental health

2    conditions that are under challenge are medication and then

3    surrendering to civil commitments.  Let's talk about those.

4    The medication provision, let's start with what it doesn't

10:17:36  5    do.  What it doesn't do is say that the probation officer will

6    just order Mr. Kikkert, you must take your medication.  What it

7    does is it sets forth a process where, first, a mental health

8    professional, a psychiatrist, a doctor, someone who has

9    specialized training and experience, unlike with respect to

10:18:04  10   everyone else in this courtroom, who can say medication is or is

11   not appropriate.  They have the first call.  And if they say

12   it's not appropriate, then this is moot.  But if they say it is

13   appropriate, it's not a violation, it's not something where Mr.

14   Kikkert can be hauled into jail if he doesn't take his

10:18:24  15   medication right there on the spot.  What this Court would do is

16   if Mr. Kikkert challenged that determination and said that's not

17   appropriate for X, Y, and Z reasons, this Court would hold a

18   hearing, and we would all reconvene, and the Court could hear

19   from the doctor directly as to why, in their judgment, they

10:18:47  20   think it's appropriate or not appropriate.  Mr. Carroll, who is

21   a very skilled advocate, could tell the Court whether that's not

22   correct or whatever the defense position is, and the Court,

23   ultimately, would make that determination.

24   And that is far preferable to the alternative, which is

10:19:10  25   that if a medical professional says medication is appropriate

1    and needed, Mr. Kikkert can simply say no.  And I don't make

2    that statement lightly.  I am well aware that people who are

3    suffering from mental health challenges often report that

4    medication has an adverse effect on their state of being and how

5    they go about their day, fuzziness of thinking, other side

6    effects.

7         But because of the extreme danger that Mr. Kikkert posed,

8    at least during this period, trying to get a gun, I think it's

9    appropriate that a mental health provider -- or there's at least

10   some world in which medication may be both necessary and

11   appropriate to protect the public health, again, with the court

12   backdrop of having a hearing to determine ultimately that that's

13   important.  So that's issue one.

14        Issue two is this provision that says -- that, again, has

15   been posed in other cases, that if a mental health provider says

16   things have gotten so bad for Mr. Kikkert that he needs to

17   submit to civil commitment that he needs to be hospitalized,

18   that that is part of this condition of supervision.  And of

19   course, the Court could promptly hold a hearing and determine

20   whether, indeed, that is appropriate or, instead, some other

21   steps should be made.

22        You know, the defense challenge to that is, well, wait,

23   there's a Washington State, King County civil system, just let

24   that play out.  But Mr. Kikkert is not a member of the public,

25   he is, after today, going to be under the supervision of this

Court in terms of what he can and he cannot do.  You know, supervision necessarily curtails liberty.

And the way I look at this provision is it's really an extension of the standard mental health condition that the Court -- is being proposed to the Court, it's not even being challenged, which is, in general, he has to undergo mental health treatment and follow the recommendations of his treatment provider.  And if one of those recommendations is he needs to be committed for some period of time to stabilize his mental health, that is a necessary consequence or result of just what would be a standard condition of the recommendations of the treatment provider.  But what this provision does is it allows and recognizes that, of course, we would have a hearing promptly to make sure that his liberty interest was protected and, indeed, that was the right result.

Because he's under the supervision of the Court, this Court should be making that determination, as opposed to down the street in King County, which is, of course, apart, separate, outside of the framework of this case.

So those are the two conditions, which, again, are currently in effect that we think should continue to remain in effect as part of the terms of supervision.

The second sort of disputed condition is electronic monitoring.  And I take it there are sort of two -- let me start with, the Court should do that because this offense, as the

Court saw, involved computers. You know, Mr. Kikkert made some
of the threatening comments by computer, he posted on Facebook
some of the -- at least one of the threatening comments, and
then, again, tried to acquire a gun using social media. So
computers were part of this offense.

And what I understand the defense objection to be is sort
of twofold. The first is this notion that this case is like the
*Sales* case, that Ninth Circuit case about -- it's just too broad
to impose monitoring for this type of offense. And *Sales* is
apples and oranges from this case. That case involved
counterfeiting. And the conduct in that case was using a
scanner or some other computer equipment to try and fabricate
whatever the counterfeit notes were in that case.

And you could understand in the context of that case in
terms of coming up with the appropriate condition to ensure that
that type of conduct did not occur in the future could be and
appropriately would be somewhat narrow. You don't need to
monitor someone's social media account if the underlying offense
conduct is limited to scanning and fabricating on the computer
different commercial notes. Those are unconnected.

But here, the concern is that not only did Mr. Kikkert use
the computer to communicate both his threats and the manner in
which he would potentially carry out the threats, also his
communications and his -- would be a window into the state of
his mental health. I mean, a lot of the communications are just

rambling, they don't make any sense, they're nonsensical.  And
that would be a state or a flag as to what his -- what the state
of his mental health was.  So we do think that that's
appropriate.

10:25:18        You know, there's this objection that it can't be so broad
to be any computer at all.  And to the extent the Court was
concerned about that, I think the condition, and we could write
this in, would be limited to computers that are able to
communicate with others or access web content.  I think that, in
10:25:39    the heartland, would be the type of computer conduct that would
be appropriate to monitor.

        The second sort of objection from the defense is, well,
look, he did this all out in the open, he used his real name,
this wasn't a dark web type of case where he was trying to hide
10:26:01    what he was doing, so we don't really need to monitor him.  But
the problem is --

            THE COURT:  Counsel, I have a clarifying question
there.  On the Facebook post, was he using his real name?

            MR. WOODS:  I believe he was.  And if he wasn't, he
10:26:12    was posting his own picture.  He wasn't trying to hide it, so
I'm not going to -- the Court should assume he was open and
notorious.

        But the challenge there is what is the probation officer
going to have visibility to see.  I mean that -- if they are
10:26:31    sort of cutoff from his e-mail communications, from any private

1   Facebook messages that are used, or anything that is not, you

2   know, sort of you can discover through Google, which, let's face

3   it, would be a small slice of his internet activity, you're

4   left, or the Court is left, with what fortunately happened here,

10:26:54   5   which is that people came forward and said we're concerned about

6   what's happening.  But that was fortuitous, that very well would

7   not -- could not have happened for a million reasons, and so

8   that type of monitoring would be effective.

9        And, you know, as with all supervised release cases, this

10:27:13   10   will be a journey as opposed to just a destination here today.

11   I mean, if Mr. Kikkert six months from now, a year from now,

12   whatever it is, is doing great, he's employed, you know, there's

13   no signs of mental distress, his health is fine, of course the

14   Court should at that point, very well with the government's

10:27:36   15   recommendation, relax the requirements.  I mean, we joined the

16   defense request or at least didn't oppose his release in this

17   case pending the sentencing because he had shown some

18   improvement, so, you know, that is an option.

19        But I think from a starting out point from where we are

10:27:54   20   today, at least for some period of time, these are the two

21   conditions that will help ensure his -- the public safety

22   and, and will also further that first goal of compassion,

23   because what we all don't want to have happen here is for

24   another criminal case to start, for Mr. Kikkert to return to

10:28:19   25   jail.  I don't want to see him in jail.  I didn't -- I take no

pleasure at all in Mr. Kikkert having a felony conviction in
this case, these proceedings, we want him to be well.  But if he
shows the signs and he goes down this path again, to protect
that public safety, that's where we get involved.  And I think
these two conditions will be early guardrails and markers to
insure we don't get back to where we were at the start of this
case, and that's why we recommend the Court impose them.

And I do, of course, think the Court should impose three
years of supervised release.

And I'm happy to answer any of the Court's questions.

THE COURT:  I have no further questions.  Thank you,
Counsel.

Mr. Carroll.

MR. CARROLL:  Thank you, Your Honor.

We ask the Court to follow the joint recommendation in
terms of time served term of custody.

Probation department has eloquently outlined its reasons
for that, as well as the government.  I think it's warranted in
light of Mr. Kikkert's mental health issues, his military
service, which are the likely cause of those mental health
issues, his past trauma, and I would add his performance on
pretrial supervision.

Mr. Kikkert was arrested in early April.  He spent about
three months in custody already, was released in July.  He's
taken responsibility, he's pled guilty.  He and I have had many,

1  many conversations about, you know, the fact that these kind of

2  statements are not the way to effect any policy change or get

3  any attention to issues that he thinks is appropriate.

4      Unfortunately, you know, the -- these type of statements

5  have become a little bit more normalized in certain media

6  circles in this country.  And I think Mr. Kikkert is -- given

7  his background and mental health issues is perhaps a bit

8  vulnerable to those sorts of media circles.  He's not blaming

9  anyone else, he takes full responsibility, but I think that's

10  something that should be recognized.

11      He's in treatment and counseling at the VA.  I think it's

12  all laid out in the probation recommendation.  There is a

13  section or a part of the probation recommendation that notes

14  he's resistant to treatment, but just to be clear, he is in

15  biweekly counseling at the VA.  He sees a psychologist biweekly.

16  He started a coping skills class or group at VA.  He's in a

17  co-occurring disorder group.  He's reinstated his housing

18  benefits, he's looking for an appropriate housing placement, one

19  that's in a low crime area, which I think is good that he's

20  being patient waiting for a good place to go, one that won't

21  trigger him, won't -- you know, one that won't raise his anxiety

22  levels.

23      There is some concern expressed about his resistance to

24  antipsychotic medications.  Mr. Kikkert has been very clear

25  about that.  But I do want to let the Court know that he has

gotten the referral to see a psychiatrist through the VA.  That was done about two weeks ago.  He's waiting to hear back on the appointment.  He was told that that can take some time because the resources for the psychiatrist through the VA is -- it's kind of thin.  But he's willing to see a psychiatrist, he's willing to talk about medications, and take it from there.

And so at this point, I think a term of custody would be counterproductive, it wouldn't be consistent with the 3553(a) factors, and, in fact, it would be a setback in terms of promoting community safety and specific deterrents.

Turning to the supervised release conditions, I'll start with the computer search and computer monitoring conditions, which I don't think are in place on the current bond.  The conditions allow probation to search any computer owned or operated by Mr. Kikkert, and there's the computer monitoring program.  It basically monitors all activity on his electronic devices, whether it be a phone or a computer.

The conditions have to be reasonably related to the sentencing factors and narrowly tailored or the least restrictive means necessary.  And here, the conditions proposed are not sufficiently narrow, they're too broad.  And I would suggest that they're not sufficiently related to the underlying offense.

Looking at the PSR, Mr. Kikkert, yes, he used a computer in some instances, but I think most of the time these were phone

1    calls or voicemails.

2        Some of the statements cited in the PSR were personal

3    encounters with Washington, D.C. Secret Service or Capitol

4    Police.

5        THE COURT:  Mr. Carroll, this includes all electronic

6    devices; correct?

7        MR. CARROLL:  That's -- yes.  I would suggest the

8    condition is quite broad.

9        THE COURT:  And that would include internet enabled

10   cell phones, as we had some text messages in this case?

11       MR. CARROLL:  Yes.  Yes.  I'm not sure it would apply

12   to, say, a flip phone that does text messages.  I would ask

13   probation -- so probation is nodding yes, so, yes, it would

14   apply to anything.

15       And the computer monitoring program basically allows a

16   search of just everything.  And as the government points out,

17   they admit this condition is really just to monitor his inner

18   thinking, to keep tabs on him, to see where his thoughts are

19   going, to see whether he's writing rational things.

20       And, you know, Mr. Kikkert uses a computer to -- he writes

21   poetry, he shared some of his poetry with me.  He keeps a

22   journal.  He maintains a website for -- to sort of outline his

23   religious views that's publicly available.  He uses a computer

24   and phone to schedule medical and mental health appointments, to

25   maintain benefits.

1    And the computer monitoring program is costly.  There's a

2  monthly fee as well as an initial start-up fee for each separate

3  device.

4        THE COURT:  Mr. Carroll, in terms of the government's

10:35:24  5  statements that this is really a journey, and we're headed down

6  a path to see what treatment might be effective, what is your

7  response to the fact that we can revisit this?  If it's going

8  well, not just the mental health treatment, but the computer

9  monitoring, that we can revisit these conditions.  And why

10:35:54  10  shouldn't we start more protective given the unpredictability of

11  this path and the seriousness of the threats that were made?

12        MR. CARROLL:  Well, I would suggest the Court focus,

13  instead, on his behavior and how he's doing with the conditions,

14  whether his treatment providers are raising alarm bells.  And

10:36:11  15  rather than starting up high and maybe ratcheting down, which if

16  I were Mr. Kikkert, I would just say I'm not using any of these

17  devices, and so there'd be nothing to monitor.

18    What I would suggest is that the Court not impose these

19  conditions, but if there are issues, then the Court can always

10:36:32  20  modify the conditions.  That's something else the Court can do.

21  So rather than taking a tight ratchet and then maybe loosening

22  sometime in the future, I would suggest the opposite in terms of

23  these computer monitoring conditions.

24        Does that address the Court's question?

10:36:52  25        THE COURT:  Yes.  Thank you.

1          MR. CARROLL:  Okay.  Thank you.

2      And again, Mr. Kikkert was open and notorious about who he

3  was.  And this is not a situation where -- like a child

4  pornography offense, or a dark web case, or a fraud case where

10:37:10    5  someone is surreptitiously using the internet to commit crimes.

6  If Mr. Kikkert is going to reengage in this behavior, which I'm

7  confident he's not, it's not going to be some secretive,

8  anonymous posting or messaging, it's going to be open and

9  notorious and easily identifiable.

10:37:33   10      And I would suggest that this case is a lot like the *Sales*

11  case.  Yes, that -- the crime committed in that case was a bit

12  different, but the principles still apply, and I would say even

13  more so.  *Sales* was decided in 2007.

14      Since then, it's really hard to do much without having a

10:37:53   15  computer -- regular access to a computer.  You can't search for

16  a job without a computer.  You can't manage benefits without

17  using a computer, or it's at least very difficult to.

18  Communicating with your treatment providers usually requires

19  e-mail or text messages.

10:38:15   20      So the ubiquitousness with which computers are in our lives

21  really goes to how extremely expansive this kind of condition

22  is, as noted by the *Sales* court.

23      And I would point out, there really are no limitations to

24  the probation department's computer monitoring program.  There's

10:38:37   25  no limits to that, so it's very, very intrusive.  And the case

1    law requires that the conditions be narrowly tailored to achieve

2    the goals of sentencing.

3    I do want to point out, in the government's memo, they

4    pointed out texts Mr. Kikkert sent to the probation office, and

5    I kind of want to put those in context. I don't know if

6    probation has communicated with the Court about that, but Mr.

7    Kikkert and I were communicating by text and e-mail about the

8    recommendation, and we were having a robust discussion about it.

9    And at about the same time, probation texted him and said, hey,

10   we need to do a home visit. And so Mr. Kikkert started

11   replying, he thought he was replying to me, he was replying to

12   the probation department, but he quickly got back to the

13   probation department and, you know, texted probation that -- an

14   apology that, you know, sorry, those texts were meant for my

15   lawyer. Yes, we can do a home inspection, let's schedule that.

16   Here's when I'm busy, here's when I'm available. And again, he

17   apologized for the response.

18   I would suggest an alternative condition. And Mr. Kikkert

19   would disclose his e-mail addresses, any social media platforms

20   that he's on, his phone number. And, yes, that requires that we

21   trust that he's going to actually disclose everything. But if

22   there are any issues, probation can monitor his website. They

23   can monitor his social media. It can be a condition that he has

24   to like friend them if he's on Facebook. I don't know if he's

25   still on Facebook.

1    But, again, this is not an offense that was committed
2 secretly or anonymously, so I just don't think the condition is
3 appropriate here.
4    Turning to the medication and civil commitment conditions,
10:40:45  5 again, we have no objection to the requirement that he
6 participate in treatment.  But, again, the focus should be on
7 his behavior, not whether or not he's taking his medications
8 every day.  And I don't think the Court should inject itself
9 into those sorts of determinations.  Those are medical issues.
10:41:05 10 And the case law is pretty clear that this Court has to make a
11 thorough inquiry that is medically based before ordering such a
12 thing.  And here, we don't even know --
13    THE COURT:  Isn't that built into the special
14 condition?
10:41:25 15    MR. CARROLL:  Well, it does allow for a hearing before
16 this Court, but it doesn't require -- the condition does not
17 have any, what I can see, are really articulable standards,
18 so --
19    THE COURT:  But I'm bound by that case law; correct?
10:41:41 20    MR. CARROLL:  True.
21    But the condition doesn't outline what's appropriate, what
22 goal the medication is necessary to achieve, is it necessary to
23 make him competent?  Well, it's clearly not an issue here, Mr.
24 Kikkert is competent, he's doing well.
10:42:03 25    Typically, forced medication cases under *United States v.*

1    *Sell*, you have a *Sell* hearing where there's a particular goal

2    that needs to be achieved for the medication.  Is it necessary

3    to make the person competent, for example.  And here, the

4    condition is just, well, if someone recommends it.

10:42:26   5    And so, antipsychotic medications, the government

6    acknowledges that, you know, that's a big deal, it's very

7    intrusive.  And here, we're not even sure what it is that would

8    be recommended.  And again, this is something that could be

9    ratcheted up.  If we learn that something is recommended and

10:42:44  10   he's not doing well, then perhaps it could be modified to add

11   that, and we can have a hearing about it.

12   But, again, I think the Court should focus on how he's

13   doing in the community, whether he's otherwise compliant and

14   responsive to probation, rather than starting off with

10:43:06  15   conditions such as this that -- which can be viewed as very

16   intrusive.  And I think, also, it would start Mr. Kikkert off on

17   the wrong foot with probation.

18   And similarly, with the involuntary treatment issue.

19   Again, the Involuntary Treatment Act has very specific and

10:43:27  20   well-defined terms that justify commitment for specific periods

21   of time.  There are mental health professionals who are trained

22   under the law who are very familiar with the process.  And they

23   make the initial commitment decisions based on whether the

24   person is a danger to themselves or gravely disabled or a danger

10:43:53  25   to others.

1    And here, there's no real standard outline, it's just,

2  well, if someone -- if a mental health professional, if like --

3  who, is that a social worker?  Is that a psychiatrist?  What is

4  required there, what qualifications, and also, for what reason?

10:44:13  5  Is it necessary because he's not complying with conditions?

6  Well, the Court has options.  The Court can get an arrest

7  warrant.

8    So without any standards, I'm not just not sure whether the

9  condition is workable in real time for those involved with Mr.

10:44:35  10  Kikkert's supervision.

11    And again, there are other tools.  Probation could get a

12  warrant.  They can call a designated crisis responder who is

13  trained and have that person initiate commitment if that is

14  necessary.

10:44:51  15    So we would ask that those conditions not be imposed.

16    Again, overall, Your Honor, the Court is directed to impose

17  the minimum term necessary, and I think that also -- that sort

18  of language applies to the supervised release conditions, that

19  they should be narrowly tailored.  And here, a narrowly tailored

10:45:12  20  judgment should not include those conditions.

21    I don't have anything to add, unless the Court has any

22  questions.

23    And I know Mr. Kikkert has a short statement for the Court.

24        THE COURT:  I have no further questions.

10:45:24  25    And before we hear from Mr. Kikkert, does either party have

1  any witnesses or witness statements that they would like to
2  present?

3          MR. WOODS:  No, Your Honor.

4          MR. CARROLL:  No, Your Honor.

10:45:32  5          THE COURT:  All right.  Is there any other person that
6  would like to address the Court regarding either the government
7  or defense counsel's recommendation?

8      All right.  Hearing nothing, Mr. Kikkert, you have a right
9  to make a statement.

10:45:48 10      I have reviewed your letter to me, but if you want to make
11  a statement, now is your opportunity to tell me anything at all
12  that you want me to know before I impose the sentence, but you
13  also don't have to make a statement.  As I said, if you don't
14  want to, I won't hold that against you.

10:46:04 15      Would you like to say anything that you would like me to
16  consider before imposing my sentence?

17          THE DEFENDANT:  Yes, Your Honor.

18          MR. CARROLL:  Would you like Mr. Kikkert to approach
19  the lectern or --

10:46:14 20          THE COURT:  Whatever is more comfortable for you, Mr.
21  Kikkert.

22      And you may remove your mask, if that's more comfortable.

23          THE DEFENDANT:  Your Honor, the things I said and did,
24  it was just to get attention, as I felt I had no other choice to
10:46:32 25  be heard.  I did so without intent to do harm.  I do apologize.

1    I will not threaten anyone again.  I live a life of peace

2  and sanctity of all life, and I want you to understand that I do

3  understand my mistake.  And I ask for mercy.

4    THE COURT:  Thank you.

10:47:03  5    I will now turn to the 18 U.S.C. 3553(a) factors.

6    After calculating the sentencing guidelines and departures

7  and hearing the statements made by counsel and Mr. Kikkert, I

8  will now consider the relevant factors set out by Congress in 18

9  U.S.C., Section 3553(a), and insure that I impose a sentence

10:47:29  10  that is sufficient, but not greater than necessary to comply

11  where the purposes of sentencing.

12    There are seven factors I should consider under Section

13  3553, and I will go through each of them in my considerations

14  under each now.

10:47:44  15    First, with respect to the nature and circumstances of the

16  offense.  Mr. Kikkert, you've pled guilty to one count of

17  interstate threats.  These threats were made to public

18  officials, public servants, and the threats were extremely

19  serious, including threats of bodily injury and death.

10:48:04  20    You physically traveled to Washington, D.C. where those

21  public officials were located, and you posted on social media

22  and texted about obtaining firearms and body armer.  These

23  threats and actions are inexcusable.

24    I do recognize, though, that you have accepted

10:48:21  25  responsibility for committing this serious crime.  And I also

recognize that as the government states in its sentencing

memorandum and repeated today, your actions stemmed from mental

illness, rather than malice.

     With respect to the history and characteristics of Mr.

Kikkert, I first acknowledge that you've served your country in

the military, and that you enlisted at a young age, right around

the time that you earned your GED.  I thank you for your

service.

     I also acknowledge that you experienced trauma during your

service and are suffering from PTSD as a result.

     In your outpatient health assessment from the VA in July of

this year, you were again diagnosed with PTSD, and you were also

diagnosed with delusional disorder and alcohol use disorder.

     In terms of your life before today, you've experienced some

violence in your life.  You were stabbed by your sister when you

were only two years old, and you observed and experienced

abusive behavior by your father.  You've also experienced

violence from others in the past several years.  And you lost

your father in 2019.  And I'm very sorry for your loss.

     You're now 37 years old, and you've taken positive steps to

address some of the problems you're experiencing.  You attended

a two-year PTSD class, have been seeing a psychologist biweekly,

and have been attending an active recovery group every year.

     With your GED and other training, you've been able to work

in several fields outside your work in the military, as a

1   building inspector and as night lead at a grocery store.  And

2   according to your statements to the pretrial supervision office,

3   you would like to look for work again.  You've also turned to

4   faith and religious practice.

10:50:09   5      In terms of factor three, the need for the sentence imposed

6   to reflect the seriousness of the offense, promote respect for

7   the law, and provide just punishment for the offense, to afford

8   adequate deterrents to criminal conduct, to protect the public

9   from further crimes of the defendant, and provide the defendant

10:50:29   10   with needed educational or vocational training, medical care, or

11   other correctional treatment in the most effective manner, I

12   need to weigh the extremely serious and dangerous nature of the

13   crime you committed and your criminal history with the promise

14   that government and probation see in you because they recommend

10:50:48   15   a sentence that is very significantly below what the sentencing

16   guidelines recommend.

17      With respect to the fourth factor, the kinds of sentences

18   available and the sentencing range established for the

19   applicable category of the offense committed by the applicable

10:51:05   20   category of the defendant as set in the guidelines, I will take

21   this moment to describe generally the applicable statutory and

22   guidelines penalties for this offense.

23      And, Counsel, I'll ask you to confirm whether this

24   description is accurate.

10:51:19   25      Under the statutes, the charge for interstate threats

1    carries a term of imprisonment for up to five years, with a term

2    of supervised release limited to three years.  Under the

3    guidelines, a total offense level of 17, with a criminal history

4    category of 1 carries a term of imprisonment of 24 to 30 months.

10:51:40    5    And the supervised release term for a Class D Felony, like this

6    one, is one to three years.

7         Since the offense is a Class D Felony, under the statute,

8    Mr. Kikkert is eligible for not less than one, nor more than

9    five years probation; however, since the applicable guideline

10:51:58    10   range is in Zone D of the sentencing table, he is ineligible for

11   probation under the guidelines.

12        Under 18 U.S.C., Section 3571(b), a fine of up to 250,000

13   can be imposed, while the guidelines fine range is between

14   $10,000 and $95,000.

10:52:17    15        Under 18 U.S.C., Section 3013(a)(2)(a), there is a $100

16   mandatory special assessment for the charge.

17        18 U.S.C., Section 3663(a) makes restitution mandatory in

18   this case.  The guidelines also state that the Court shall enter

19   a restitution order for the full amount of the victim's loss,

10:52:40    20   but in this case the victims are not seeking restitution.

21        Counsel, have I stated accurately the statutory and

22   guidelines framework under which we're operating in regard to

23   this case?

24             MR. WOODS:  Yes, Your Honor.

10:52:50    25             MR. CARROLL:  Yes, Your Honor.

1    THE COURT:  So, Mr. Kikkert, the sentence that the

2 parties and probation have recommended is significantly lower

3 than what's allowed for by the statutes and guidelines for the

4 charges to which you've pled.

10:53:04  5    With respect to the fifth factor, any pertinent policy

6 statement, I believe the only guidelines policy statement

7 applicable here is Section 6B1.2, standards for acceptance of

8 plea agreements.

9    Do the parties believe any other policy statement applies?

10:53:21  10    MR. WOODS:  No, Your Honor.

11    MR. CARROLL:  No, Your Honor.

12    THE COURT:  With regard to the policy statements on

13 standard for acceptance of plea agreements with respect to Rule

14 11(c)(1)(A), I am satisfied that the Plea Agreement adequately

10:53:35  15 reflects the seriousness of the actual offense behavior and

16 accepting the Plea Agreement will not undermine the statutory

17 purposes of sentencing or the sentencing guidelines.

18    With respect to Rule 11(c)(1)(B), I'm satisfied that the

19 recommended sentence pursuant to the Plea Agreement is outside

10:53:52  20 the applicable guidelines range, but for justifiable reasons.

21    And the reasons that have been set forthwith specificity in

22 the presentence report and the parties briefing will be included

23 in the Statement of Reasons form.

24    With respect to the need to avoid unwarranted sentence

10:54:13  25 disparities among defendants with similar records who have been

found guilty of similar conduct, the parties have recommended

that I vary downward from the guideline range.  I looked at the

Sentencing Commission's Judiciary Sentencing Information System

or JSIN, just so we all have some point of reference, but that's

all it is, a data point for me.

If I used JSIN correctly for those in Mr. Kikkert's same

offense level, criminal history category, and primary guideline,

62 percent of the sentences imposed were a downward departure or

variance from the guideline range during the last five fiscal

years, from 2017 to 2021.  It is a very small sample size, but

15 percent, 1-5, of sentences were a probation or a fine only.

And the last factor is the need to provide restitution to

any victims of the offense.  The statute and the guidelines make

restitution mandatory in this case, but, again, in this case,

the victims are not seeking restitution.

Based on the Court's consideration of all of the 3553(a)

factors, I will now state the sentence to be imposed:

It is the judgment of the Court that you, Mr. Kikkert, are

hereby sentenced to time served, followed by a term of three

years of supervised release on Count I.

The Court finds that you do not have the ability to pay a

fine and, therefore, waives imposition of a fine in this case.

However, the Court cannot waive and must impose a special

assessment fine in the amount of $100, which is due immediately.

Within 30 days of any change of address, you must notify

the Clerk of Court of the change until such time as the
financial obligation is paid in full.

    The Court waives any interest or penalties that may accrue
on unpaid balances.

    Within 72 hours, you shall report in person to the
probation office.

    And while on supervision, you shall abide by the mandatory
as well as general conditions of supervision adopted by the U.S.
Probation Office.

    In addition, you will abide by the special conditions set
out by the U.S. Probation Office.  I find that these special
conditions are appropriate and necessary based on the facts and
circumstances presented.

    I will also go over my additional rationale for the four
special conditions in dispute.

    The first special condition requires you to allow a
probation officer to inspect any personal computer that you own
or operate.  This is a standard we frequently impose where, as
here, a crime has been committed using electronic devices and
online resources.  The reasons for this condition are related to
the reasons for the next condition, so I'll go over the reasons
after I go over the next condition.

    The second special concern requires you to comply with the
requirements of the probation and pretrial services computer
monitoring program as directed.  You shall consent to U.S.

Probation and Pretrial Services Office conducting ongoing
monitoring of your computer, hardware, and software, and any
electronic devices or media.  The monitoring will include the
installation, at your expense, of hardware or software systems
that allow evaluation of your computer use.  Monitoring may also
include the retrieval and copying of all data from your
computers or any other electronic devices or media.

You may be subject to quarterly polygraph testing at your
expense.  And this is solely to ensure compliance with the
monitoring program.

You also content to U.S. Probation and Pretrial Services
use of electronic detection devices to evaluate your access to
Wi-Fi connections.

The Court is imposing these conditions because you used
electronic devices and online access to commit your crime, a
very serious crime, that included threats to someone's life.
And in a matter of days from sending an e-mail stating that you
would assume the role of acting president with the law of the
land, you traveled to Washington, D.C., and then posted on
Facebook that you wanted to buy armors, and then sent text
messages talking about finding body armor.

Part of the goal of these conditions is to protect you and
to protect the public.  And given the unpredictability, as I
said, of this journey, these kind of manifestations of mental
illness, the breadth of online avenues and electronic devices

that you used to make your threats, and the fast pace with which those threats escalated to actual travel to the location of the targets of your threats, the computer monitoring condition, coupled with the computer inspection condition, are the least restrictive means possible of protecting the public from future offenses, deterring you from committing any future offenses, and ensuring there is timely intervention to get you any help that you may need.

Now, as everybody has acknowledged here today, you are doing a great job taking these steps that are needed to improve. And if that continues, we'll certainly revisit this. So this is a path forward for you.

I'm going to move on to the fifth and sixth condition.

The fifth special condition, which is expressly listed in section 11 of your Plea Agreement, requires you to participate as directed in a mental health program approved by the United States Probation Office and follow all recommendations of the treatment provider, to include psychotropic medications. However, your refusal to take psychotropic medication prescribed by such treatment provider shall not be a violation of supervised release unless the Court, after affording you due process, determines and orders that you shall be compelled to take such medication and you thereafter violate the Court's order.

You must contribute towards the cost of any programs to the

extent that you're financially able to do so as determined by the U.S. Probation Office.  Given the connection between your mental health issues and the crime for which you've been convicted, this condition is the least restrictive means possible of protecting the public from future offenses, deterring you from committing any future offenses, and ensuring that you remain in good mental health, with the aim of rehabilitation.

With respect to medication, right now we just don't know if a psychiatrist will recommend medications for you.  I'm pleased to hear that you've made that contact and that an appointment is forthcoming.

I will direct defense counsel to submit to the Court, once you do actually have the result of that meeting, if any medication was prescribed; and if so, what the justification is.

And if you have any concerns with the medication, we will have a hearing.

I will consider the recommendations of your healthcare provider.  And if they do prescribe medication, I will direct your probation officer to check in with you at least monthly to see how you feel about the medication and its effectiveness.  And if you have any concerns about the medication, I will direct the probation officer to report that to the Court, and the Court will consider making adjustments to this approach as appropriate.  And if things are going well, as everybody has

acknowledged today, we can reduce the frequency of these medication check-ins and reports.

The 6th special condition, which is expressly listed in section 11 of your Plea Agreement, requires you to submit to psychiatric hospitalization if directed by your mental health treatment provider for a period not to exceed 72 hours, which may be extended if ordered by the Court after an opportunity to be heard.

Again, given the connection between your mental health issues and the crime for which you've been convicted, this condition, which is also expressly listed in your Plea Agreement, is the least restrictive means possible of protecting the public from future offenses, deterring you from committing any future offenses, and ensuring that you remain in good mental health, with the aim of rehabilitation.

The probation office shall release the presentence report to all appropriate agencies in order to execute the sentence of the Court.

Treatment agencies shall return the presentence report to the probation office upon Mr. Kikkert's completion or termination from treatment.

I believe that this overall sentence reflects the seriousness of the offense and also is sufficient but no greater than necessary to carry out the objectives of sentencing under the circumstances present in this case.

1  Are there any objections to the sentence as I just stated

2  it that are not already noted on the record?

3          MR. WOODS:  No, Your Honor.

4          MR. CARROLL:  No, Your Honor.

5          THE COURT:  I then hereby order the sentence imposed

6  as just stated.

7      Mr. Woods, do you have the judgment form before you?

8          MR. WOODS:  Yes, may I approach Mr. Carroll?

9          THE COURT:  I do want to go over Mr. Kikkert's right

10 to appeal, so I'll ask you to wait before approaching Mr.

11 Carroll.

12     Mr. Kikkert, I'm going to go through with you your rights

13 on appeal.

14     It is my understanding that under section 14 of the Plea

15 Agreement, you waived your rights on appeal.  And any rights you

16 had on appeal are exactly as stated in that document.  If you

17 wish to appeal the sentence, it's very important that you tell

18 your lawyer that is what you want to do.  Your attorney can

19 explain what issues may be appealable and what issues survive.

20     If you wish to appeal the sentence, but cannot afford the

21 filing fee for Court of Appeals, you can ask me to waive that

22 fee and the Clerk of Court will prepare and file a notice of

23 appeal upon your request.

24     With few exceptions, any notice of appeal must be filed

25 within 14 days of the entry of judgment.

1    I advise you that you also have the right to challenge your

2  counsel's effectiveness.

3    Mr. Kikkert, do you understand each of these rights?

4    THE DEFENDANT:  Yes, Your Honor.

11:03:58    5    THE COURT:  This concludes the Court's judgment in

6  this case.

7    I will now turn to dismissal of Count 2.  As set forth in

8  the Plea Agreement, the government pledged to move to dismiss

9  Count 2 against Mr. Kikkert.

11:04:11   10    Does the government wish to do so now?

11    MR. WOODS:  Yes, Your Honor.

12    THE COURT:  That count is dismissed.

13    Mr. Kikkert, do you have any questions about anything that

14  has been said at today's hearing.

11:04:22   15    (Off the record.)

16    MR. CARROLL:  Your Honor, Mr. Kikkert is inquiring

17  whether or not it's possible to set a future date regarding

18  revisiting some of the conditions, particularly the computer

19  monitoring conditions.

11:04:48   20    THE COURT:  I'll ask the probation office to weigh in

21  on what that appropriate date might be.

22    U.S. PROBATION OFFICER WHALEY:  Your Honor, I would

23  recommend either six months or one year from now.

24    THE COURT:  Let's do six months.

11:05:00   25    Any further questions?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Anything else we should address today?

MR. WOODS:  I don't believe so, Your Honor.

MR. CARROLL:  No, Your Honor.

THE COURT:  All right.  You may show the judgment to Mr. Carroll.

MR. CARROLL:  Your Honor, I've reviewed the judgment. It is consistent with the Court's oral sentence.

THE COURT:  Thank you.

You may approach -- or you may show the probation office.

MR. WOODS:  Thank you, Your Honor.

(Off the record.)

MR. WOODS:  Your Honor, may I reproach Mr. Carroll?

THE COURT:  Yes.

MR. WOODS:  Your Honor, I showed the judgment again to Mr. Carroll.  May I approach now?

THE COURT:  Yes.

MR. CARROLL:  Thank you.

THE COURT:  I have reviewed the judgment and find it is in good form and have signed it.

I will end this sentencing by emphasizing to everyone that we sentence people for what they do, not who they are.  Everyone in this room has hope that things will work out for the better for you, Mr. Kikkert.  And that is reflected in the fact that the government, your lawyer, and probation all ask that you be

1    sentenced under, well under, the guidelines range.  There

2    obviously need to be very serious consequences for the crime you

3    committed, but you've shown that you can accept responsibility

4    for your actions and take steps to get help to improve your

11:08:03    5    life.

6         I want to focus on something that you said to me in your

7    letter, which is that you now understand that there is a better

8    way to deal with these issues, and you repeated that again

9    today.  And you said in your letter that you're also happiest in

11:08:18    10    exercising your faith and your religion.

11         Mr. Kikkert, at 37 years old, you still have a long life

12    ahead of you.  And I hope you continue taking these positive

13    steps in realizing that everyone here wishes the best for you.

14         I'd like to extend my thanks to everybody here for their

11:08:35    15    participation today.

16         We are adjourned.

17              THE CLERK:  Please rise.

18              (Court recessed at 11:08 a.m.)

19                   C E R T I F I C A T E

20         I certify that the foregoing is a correct transcript from

21         the record of proceedings in the above-entitled matter.

22              /s/ Marci E.C. Chatelain

23              Marci E.C. Chatelain, CCR, RPR, RMR, CRR
                Federal Court Reporter

24

25